IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL BENSI,

    Plaintiff,

v.

EL CAMINO HOSPITAL,

    Defendant.

_____/

No. C 11-03978 CRB

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

El Camino Hospital ("Defendant") and the Trustees of the Stationary Engineers Local 39 Pension Trust Fund ("Trustees" or "Plaintiffs") are fighting over the proper scope of the Trustees audit powers. The Trustees wish to examine all the cash disbursement journals of the Hospital, ostensibly in order to determine that the Hospital is properly contributing to the Pension Trust Fund (the "Fund"). The Hospital argues this request is not needed to perform the audit, and exceeds the power given to the Trustees in the Collective Bargaining Agreement ("CBA") between the Hospital and the Stationary Engineers and the Trust Agreements for the Fund. The Trustees filed suit to enforce the request, and the Hospital filed a motion for summary judgment on the issue that it need not produce the journals. The auditors do have broad power, but the documents indicate that the request is beyond the scope of that power. Thus, the Court GRANTS the Hospital's motion for summary judgment. The Court defers ruling on the request for attorneys' fees untill after the filing of supplemental papers addressing the issues raised at the hearing held on February 17, 2012.

## I. FACTUAL BACKGROUND

The Hospital is party to a CBA with the International Union of Operating Engineers, Stationary Engineers Local 39 (the "Union"), which covers all Engineers employed by the Hospital. A CBA between the Union and the Hospital was in place during the time period in question, April 1, 2006 to May 31, 2010. Amar Decl. (dkt. 25) Ex. A (November 1, 2008 – October 31, 2013 CBA ("2008 CBA")), Ex. B (November 1, 2004 – October 31, 2008 CBA ("2004 CBA") § 1.1.[1]

The Fund is an employee benefit plan created by written Trust Agreement pursuant to section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, and a multiemployer employee benefit plan within the meaning of sections 3, 4, and 502 of ERISA, 29 U.S.C. §§ 1002, 1003, and 1132. Compl. (dkt. 1) at 2:6-10. The Fund operates for the purpose of providing pension benefits to participants and their beneficiaries and is administered by a Board of Trustees, which is comprised of two Employer Trustees and two Union Trustees. Florence Decl. (dkt. 32) ¶¶ 3, 6. The Trustees of the Fund have an obligation to identify all participants and beneficiaries so that they can be informed of their status and rights under the Pension Trust Fund. Id. ¶ 6. Plaintiffs Paul Bensi, Bart Florence, Jerry Kalmar, and Lyle Setter are trustees of the Fund. Compl. at 2:3-5.

Pursuant to Article VIII, Section 2 of the CBA, on behalf of the Engineers, the Hospital agreed to make contributions to the Fund based on the hours worked by the Engineers. Amar Decl. Exs. A, B § VIII.2. The amount of the Hospital's required contribution is a function of straight-time hours that Engineers worked or straight-time hours for which they were paid. Id. ("The Employer agrees to contribute . . . the following amounts . . . for all straight-time hours worked or paid for."). Between April 2006 and May 2010, the Hospital contributed between $4.30 and $6.35 per straight-time hour worked or paid to the Engineers. Id.

The CBA allows the Hospital to hire subcontractors to perform bargaining unit work:

---

[1] The 2004 and 2008 CBAs are identical with respect to the terms discussed herein.

> Employees shall perform duties pertaining to the operation and maintenance of mechanical and electronic equipment, and such other duties as have historically and traditionally been performed by bargaining unit classifications at the Hospital and consistent with the provisions of Article X (Management Rights) of this Agreement. Nothing shall preclude the Hospital from utilizing contractors for emergency work, construction work, operational needs, and/or work for which employees lack the skill, training or experience to perform.

Amar Decl. Exs. A, B. § 1.3 ("Jurisdiction Clause"). Thus, the CBA explicitly allows subcontracting, with few limitations. In addition, the CBA does not appear to require that the Hospital make contributions for any work performed by non-bargaining unit members, including contractors.

The CBA provides a resolution mechanism for any disputes between the Union and the Hospital over whether the Hospital is appropriately using non-bargaining unit members: "If a dispute arises as to the jurisdiction of work being performed within the hospital, such disputes shall be submitted to the Vice President of Facilities Services or his or her designee, who shall meet with the Union to resolve the issue." Id. In the last twenty years, the Union has not asserted that the Hospital improperly subcontracted bargaining work; there have not been any meetings pursuant to the Jurisdiction Clause to resolve any disputes about the jurisdiction of work performed within the Hospital; and no bargaining unit employee has filed a grievance alleging the Hospital violated the Jurisdiction Clause. King Decl. (dkt. 29) ¶¶ 2-3.

The CBA obliges the Hospital to be bound by the obligations in the Trust Agreement, which sets forth the procedures and provisions of the Trust Fund. Amar Decl. Exs. A, B § VIII.2 ("The Employer agrees to accept, assume and be bound by all of the obligations imposed on individual employers by [the] Trust Agreement . . . ."). The Trust Agreement provides that "[t]he liability of [the Hospital] to the Fund or with respect to the Plan shall be limited to the payments required by the Collective Bargaining Agreement." Amar Dec. Ex. C § 2.06. The Trust Agreement provides that "[c]ontributions to the Fund shall be due as provided in the applicable Collective Bargaining Agreements obligating the participating Employer to make contributions to the Stationary Engineers Pension Fund." Id. § 4.01.

As part of the administration of the Fund, the Trustees established a random payroll compliance testing program ("Audit Program") which Lindquist LLP (the Fund's auditor) conducts on behalf of the Fund. The Audit Program consists of regularly testing the payroll records of all contributing employers on a periodic basis. Florence Decl. (dkt. 32) ¶ 7. Specifically, the Auditors select approximately 25% of the Pension Fund's contributing employers each year for auditing to ensure that each contributing employer is tested approximately once every four years. Thiermann Decl. (dkt. 33) ¶ 4. In conducting the random audits, Lindquist states it uses the following procedures: (1) it notifies the employer of the random payroll compliance testing and the documents requested; (2) schedules an appointment; (3) performs the testing, including any field work; (4) has the employer sign an acknowledgment statement of preliminary findings; (5) summarizes the findings and prepares a summary of discrepancies and supporting payroll compliance testing report, which includes, if applicable the calculation of liquidated damages, interest and assessment of testing fees; (6) forwards a report to the employer in draft form to review; and (7) issues final payroll compliance testing report to the Fund. Id.

The text of the Trust Agreement provides that the Hospital will allow audits:

> The [Trustees] may require the Employers, any Signatory Association, any Individual Employer, the Union, any Employee or any other Beneficiary under the Plan to submit to it any information, data, reports or documents reasonably relevant to and suitable for the purposes of such administration; provided, however, that the Union shall not be required to submit lists of membership. The parties agree that they will use their best efforts to secure compliance with any reasonable request of the Board for any such information, date, report or documents. Upon request in writing from the Board, any Individual Employer shall permit a certified public accountant selected by the Board to enter upon the premises of such Individual Employer during business hours, at a reasonable time or times, and to examine and copy such books, records, papers or reports of such Individual Employer as may be necessary to determine whether the Individual Employer is making full and prompt payment of all such sums required to be paid by him or it to the Fund.
>
> In addition to the foregoing, each Individual Employer, upon request of an authorized representative of the Union, the Employers, or the Fund, shall permit auditors designated by the fund to review any and all records relevant to the enforcement of the provisions of the Collective Bargaining Agreement or this Trust Agreement. Such review shall be permitted not less than ten (10) working days after demand.

4

Amar Decl. Ex. C § 6.04.[2] The main dispute between the Parties is over the meaning and scope of this clause and the sections of the CBA laying out the Hospitals duties to the Union and the Fund.

In 2010, Lindquist selected approximately 25% of the Fund's contributing employers to perform random payroll compliance testing, and the Hospital was among the contributing employers randomly selected for a payroll testing audit. Thiermann Decl. ¶ 6. By letter dated March 18, 2010, Lindquist notified the Hospital that it would conduct an audit to determine whether the Hospital made required contributions for the period beginning April 1, 2006. Johnston Decl. (dkt. 26) Ex. A. The auditors conducted the audit over two days, June 24 and 25, 2010, on the Hospital's property. Ramsell Decl. (dkt. 27) ¶ 4.[3] The auditors examined documents and records for the period April 1, 2006 through May 31, 2010. Id.; Thiermann Decl. ¶ 7.

During the audit, the Hospital provided the auditors the hundreds of pages of documents, including copies of the operative CBAs; records of monthly transmittals to the Trust Fund, payroll registers, time cards and other documents showing wages paid and hours worked by the bargaining unit members; California Quarterly Wage and Withholding reports; and seniority lists. Ramsell Decl. ¶ 5. During the audit, Lindquist requested the Hospital's cash disbursement journals, which the Hospital declined to provide. Id. ¶ 6; Thiermann Decl. ¶ 8.

The cash disbursement journals are records reflecting all payments made to all vendors of the Hospital. Ramsell Decl. ¶ 7. The journals include the hundreds of invoices the Hospital processes each week for a variety of products and services with no relevance to the Hospital's mechanical and electronic equipment or work performed by the bargaining unit. Id. For example, the journals reflect payments for office and medical supplies; utilities

---

[2] The Trust Agreement gives the Union the "right to receive and utilize any information derived from an audit." Amar Decl. Ex. C. § 6.04. Thus, any information that the Hospital submits to the auditors can then be used by the Union for whatever purpose it desires.

[3] The Plaintiffs state the audit took place on June 25 and 26, 2010. Thiermann Decl. ¶ 7. As June 26, 2010 was a Saturday, this is likely a typo, and the Court will treat it as such.

5

1 such as PG&E; medical equipment; contracted laundry, custodial and information technology
2 services; professional services performed by legal, consulting and accounting firms; and
3 employee benefit premiums. Id. The journals also include payments for work performed by
4 contractors, such as medical equipment service vendors and construction firms. Id.

5       The Hospital believed these records were of no apparent significance to the audit per
6 the CBA, and thus, requested that the auditors put their request for the journals in writing.
7 Ramsell Decl. ¶ 8.[4] The auditors subsequently requested by letter dated June 29, 2010 all
8 cash disbursement journals for the first quarter of 2010, the third quarter of 2008, and the
9 second quarter of 2007. In the alternative, the auditors asserted that a complete vendor list
10 would be acceptable. Johnston Decl. Ex. C. This letter appeared to be a standard letter
11 issued to multiple employers, without regard to whether the requests therein were applicable
12 to the Hospital. See Ramsell Decl. ¶ 3. The Hospital and the Fund then exchanged multiple
13 rounds of correspondence regarding the relevancy of the cash disbursement journals.
14 Johnston Decl. Exs. D-F; Reis Decl. (dkt. 28) Exs. A-D. In its July 13, 2010 letter, for
15 instance, the Hospital asked the Fund to justify why the journals were relevant or necessary
16 to the audit. Johnston Decl. Ex. D. In response, counsel for the Fund asserted the journals
17 "were necessary to determine whether El Camino Hospital is in compliance with its
18 contributions obligation" and that "Federal law requires that El Camino Hospital produce the
19 books and records requested by the Trust Funds." Id. Ex. E.

20       The Hospital again requested the Fund's position on why the journals were relevant or
21 necessary to the audit in a September 27, 2010 letter. Reis Decl. Ex. A. The Fund asserted
22 that "[t]he Trust Fund's auditors determined that the cash disbursement journals were
23 relevant and necessary . . . . As such, they are entitled to the requested documents." Id. Ex.
24 B. The Hospital made a third request for an explanation by letter dated January 14, 2011. Id.

---

[4] Following the two-day audit, Lindquist prepared an "Acknowledgment Statement," part of its regular procedure. Johnston Decl. Ex. B. The Statement relates that it is "the preliminary results of the payroll testing." Id. It states: "Preliminary Results Pending Review: No discrepancies noted. All results pending further review." Id. The Hospital implies this shows everything is above-board, Mot. at 6, and the Fund states it is in no way a certification that no discrepancies were found, Opp'n at 5. The Court finds the issue not directly relevant to the question to be decided, and states no opinion on the force of the Acknowledgment Statement

6

Ex. C. The Fund's April 13, 2011 response reiterated that the "auditors have determined [the journals] are necessary to complete the audit" and "[i]t is not up to El Camino Hospital to decide which documents are necessary." Id. Ex. D.

The Fund now states Lindquist needs to review the cash disbursement journals "to review for subcontracting and to make sure El Camino Hospital is reporting correctly." Thiermann Decl. ¶ 8. The Fund states "The cash disbursement journals are necessary for Lindquist to complete a payroll compliance testing as it allows Lindquist to generate a list of vendors who may have performed bargaining unit work. Once the vendor list is generated, Lindquist reviews the subcontracting provisions of the applicable collective bargaining agreement to determine what subcontracting is allowed, if any. If subcontracting is allowed, Lindquist can exclude these vendors from the testing, thereby allowing Lindquist to independently verify what an employer, like the Hospital, has been self-reporting to the Pension Fund." Id. ¶ 9.

On August 15, 2011, the Trustees filed this action under ERISA Sections 502(a)(3) and 502(g)(2) (which entitled trustees to bring an action on behalf of a plan to enforce the terms of the plan to collect delinquent contributions), see 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), and under Section 301 of the Labor Management Relations Act (which provides remedies for breach of a collective bargaining agreement), see 29 U.S.C. § 185, alleging that the Hospital violated the terms of the CBA by failing to submit to an audit and make appropriate contributions. The Trustees assert three causes of action: (1) for breach of contract due to the alleged failure to submit to an audit; (2) for injunctive relief requiring the Hospital to submit to further auditing of its books and records, seeking the cash disbursement journals or similar records found within its check registers, general ledger, accounts payable journals, or vendor list; and (3) for damages according to proof if delinquent contributions are found during the course of a further audit. The Hospital then moved for summary judgment on all claims.

7

## II.  LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden is on the moving party to demonstrate that there is no genuine dispute with respect to any material fact and that it is entitled to judgment as a matter of law. Id. at 323.  A genuine issue of fact is one that could reasonably be resolved in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "material" only if it could affect the outcome of the suit under the governing law.  Id. at 248-49.

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything and summary judgment must be denied.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If, on the other hand, the moving party has satisfied its initial burden of production, then the nonmoving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial.  Id. at 1103.  The nonmoving party must "set out 'specific facts showing a genuine issue for trial.'"  Celotex, 477 U.S. at 324-25 (quoting Fed. R. Civ. P. 56(c)).  If the nonmoving party fails to make this showing, the moving party is entitled to judgment as a matter of law.  Id. at 323.

When the moving party does not bear the burden of proof on an issue at trial, the moving party may produce evidence negating an essential element of the non-moving party's case, and if the moving party produces such evidence, the burden shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1105-06.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255. However, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted). Rather, a court is entitled to rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment. See id.

**III. DISCUSSION**

    **A. Breach of Contract Claim**

Trustees argue the Hospital violated both the CBA and the Trust Agreement because it "has failed, refused or neglected to submit to an audit of its books and records as required by the provisions of both [of those agreements]." Compl. at 6:2-5. To survive summary judgment on a breach of contract claim, Trustees must (1) establish the existence of a contract; (2) show that they performed; (3) show that the Hospital failed to perform; and (4) show that they were damaged. Johnson v. Hewlett-Packard Co., – F. Supp. 2d –, No. 09-3596, 2011 WL 3566605, at *10 (N.D. Cal. Aug. 12, 2010) (citing Reichert v. Gen. Ins. Co. of Am., 68 Cal. 2d 822, 830 (1968)). The Hospital argues the Trustees cannot establish breach or damages.

There are three main areas of contention in the case. First, the parties disagree over the proper standard of relevance for documents requested by auditors. Second, the parties disagree about the coverage of the CBA, and the meaning of the subcontracting clause. Third, the parties disagree about the scope of the Trustees' power to request information and enforce the CBA. If the Trustees did not have a right to the requested documents, or if they were not relevant, then the Hospital has not breached the agreement by failing to provide them. The Court will address these issues in turn.

    **1. Standard of Relevance**

First, the Hospital argues the Trustees must show that the requested information is reasonably relevant to and suitable for the purposes of the Fund's administration, and necessary to determine whether the Hospital is making full and prompt payment of all sums

9

1  required to be paid to the Fund. Mot. at 5 (citing Amar Decl. Ex. C § 6.04 ("Trust
2  Agreement")). Thus, the Hospital argues the Trustees may not receive any and all
3  information simply because they desire such information. In contrast, the Trustees argue
4  they are entitled to audit documents unless an employer demonstrates the audit is for an
5  improper purpose – to improperly "expand plan coverage beyond the class defined in the
6  plan's terms or to acquire information about the employers to advance union goals."
7  Plumber, Steamfitter and Shipfitter Indus. Pension Plan & Trust v. Siemens Building Techs.
8  Inc., 228 F.3d 964, 968 (9th Cir. 2000) (citing Cent. States, Se. & Sw. Areas Pension Fund v.
9  Cent. Transport, Inc., 472 U.S. 559, 571 n.12 (1985)).

10  The Hospital argues this reading expands the holding of Central States, which stated it
11  had "no occasion to determine whether ERISA would independently confer on the trustees a
12  right to perform [an audit] in the face of trust documents that explicitly limit the audit powers
13  of trustees." 472 U.S. at 581. The Hospital argues that is the situation here because the Trust
14  Agreement limits auditors to records with are "necessary to determine whether the [Hospital]
15  is making full and prompt payment of all sums required to be paid" and records that are
16  "reasonably relevant to . . . [Fund] administration." Amar Decl. Ex. C. § 6.04. The Hospital
17  argues that since the CBA allows subcontracting, does not require contributions to the Fund
18  for work done by subcontractors, and the Trust Agreement limits the Hospital's liability to
19  those contributions set forth in the CBA, the agreements limit the audit power of the
20  Trustees.

21  The proper inquiry appears to proceed in two steps. First, does the audit request
22  forward a legitimate goal of the Trust? If so, it is likely allowed. See Siemens, 228 F.3d at
23  971 (allowing discovery of documents that the Trustees may reasonably require in
24  connection with proper administration of the plan to determine the proper scope of Siemens
25  contributions requirements). Second, there may not be authority to audit such records if "the
26  motivation for such audit is to advance an improper purpose." Id. Thus, here, it is first
27  necessary to look at whether the requested documents forward a legitimate goal of the Trust,
28  and if they do, whether the audit is actually motivated by an improper purpose. Whether the

10

1 documents forward a legitimate goal of the trust is enmeshed with the second issue – the
2 reach of the CBA and the subcontracting provision.

### 2. The Coverage of the CBA and the Subcontracting Clause

The Hospital argues the cash disbursement journals are not relevant or necessary to the audit, and thus not for a legitimate purpose. At first, the Hospital requested the Trustees to provide an explanation of how such information was relevant. In the resulting correspondence, the Trustees provided only non-explanation explanations. See, e.g., Reis Decl. Ex. B ("The Trust Funds' auditors determined that the cash disbursement journals were relevant and necessary to their completion of the payroll compliance testing. As such, they are entitled to the requested documents."); Ex. D ("El Camino Hospital is required to comply with any and all requests for documents that the Trust Funds' auditors have determined are necessary to complete the audit. It is not up to El Camino Hospital to decide which documents are necessary . . . ."). These statements do not actually demonstrate in what way the journals are relevant to and necessary for the audits.

The Trustees then stated to the Hospital – and now argue – that the journals are needed to determine whether the Hospital was properly subcontracting work. See Jones Decl. ¶ 8 (stating she told the Hospital that the auditors needed the journals "in order to determine whether the Hospital was in compliance and not improperly subcontracting out work covered by the collective bargaining agreement"); Opp'n at 8. The Trustees argue that the journals will show if the Hospital is improperly subcontracting work covered by the CBA, and thus, not contributing for work that should be contributed for under the CBA.

The Trustees' explanation is not completely clear: "The cash disbursement journals will allow auditors to generate a list of vendors who may have performed bargaining unit work. Thiermann Decl. ¶ 9. Lindquist may also need to review some vendor invoices to help determine what work was performed. Id. ¶ 11. Once the auditors have created the vendor list, they will then review the subcontracting provisions of the CBA to determine what subcontracting is allowed. If the subcontracting is allowed, the auditors can exclude the vendors from the audit, thereby allowing them to independently verify what the Hospital has

11

1 been self-reporting to the Pension Fund." Opp'n at 10. Thus, the Trustees argue they should
2 get the journals because <u>after</u> they look at them, they will then see if subcontracting is
3 allowed, and if it is allowed, then they can check that those vendors they exclude are also
4 excluded from the Hospital's self-reported list.

5       It is unclear from this explanation why the Trustees would not look to the CBA, which
6 they already have, first. The Hospital argues that the CBA clearly resolves this issue. The
7 CBA explicitly permits subcontracting: "Nothing shall preclude the Hospital from utilizing
8 contractors for emergency work, construction work, operational needs, and/or work for
9 which employees lack the skill, training, or experience to perform." Amar Decl. Ex. C § 1.3.
10 This is a broad allowance of subcontracting for many reasons. The CBA does not present a
11 limitation on the hours that can be worked by contractors, or a limitation on how the Hospital
12 can make a decision on when and what types of work a subcontractor can perform under the
13 broad dictate of the CBA. The auditors could simply first look at the CBA, which clearly
14 allows subcontracting, almost completely at the discretion of the Hospital. Thus, it is not
15 clear how information about subcontractors is relevant to the determination of whether the
16 Hospital is making correct contributions to the Fund.[5]

17       Moreover, the Hospital argues that it is not contractually required to contribute to the
18 Fund for work performed by contractors. The CBA states it "covers all Engineers employed
19 by the Hospital." Amar Decl. Exs. A, B § 1.1. In the section regarding pension
20 contributions, there is no requirement to contribute for work performed by contractors. <u>Id.</u> §
21 VIII.2. Finally, the Trust Agreement limits required contributions to those which are
22 provided in the CBAs. Amar Decl. Ex. C §§ 2.06 (limiting liability to "payments required by
23 the Collective Bargaining Agreement"), 4.01 (stating payments "shall be due as provided in

---

[5] This is supported additionally by the fact that the CBA then immediately provides a mechanism for dealing with disputes over subcontracting, stating in the next paragraph, "If a dispute arises as to the jurisdiction of work being performed within the hospital, such disputes shall be submitted to the Vice President of Facilities Services of his or her designee, who shall meet with the Union to resolve the issue." Amar Decl. Ex. A § 1.3. Thus, the CBA itself sets out the specific manner in which such issues should be dealt with. The Hospital points out that there were no disputes raised by the Union during the audit test period, or in the twenty years preceding this litigation, regarding the jurisdiction of work performed. King Decl. (dkt. 29) ¶¶ 2-3.

United States District Court
For the Northern District of California

the applicable Collective Bargaining Agreement"). Thus, even if work was done by subcontractors, such work has no bearing on the Hospital's required contribution to the Fund.

The Trustees seem to argue a contrary interpretation of the CBA. In his Declaration, Mr. Florence states the "collective bargaining agreements cover[] all engineers employed by El Camino Hospital, which means the collective bargaining agreements cover all engineering work described in the collective bargaining agreement performed by members of the Union or subcontractors." Florence Decl. ¶ 10. This statement does not include a citation to the text of the CBAs. The Trustees provide almost no argument on this issue, and nothing to support their interpretation of the CBA and the meaning of the term "Engineer." It is not clear from the text that the coverage of Engineers – which is capitalized – was meant to imply the coverage of any and all engineering work rather than certain people. In fact, the opposite conclusion seems reasonable given the specific capitalization, thus indicating specific and enumerated Engineers – specifically the members of the Union party to the CBA – and the set-up of the entirety of the CBA. Nothing in the rest of the CBA indicates it is intended to cover types of work, rather than types of workers, as indicated from the plain text.

Finally, the journals are necessary to independently verify the Hospital's contributions to the Fund. The Trustees state that "[r]eview of the cash disbursement journals is necessary because the auditors will be able to independently verify the proper universe of individuals for whom the Hospital is designated to make contributions on." Opp'n at 10. The Hospital first argues that the CBAs define the population on whose behalf the Hospital must make contributions – Engineers employed by the Hospital. Amar Decl. Ex. A, B § 1.3 ("This Agreement covers all Engineers employed by the Hospital."). Thus, it states it is not necessary for independent verification of the covered population, since it is simply all those who belong to the Union and work in the Hospital. As discussed above, the Court agrees with the Hospital's interpretation of the Agreements.

13

Plaintiffs' reliance on Central States for the independent verification argument is also misplaced because that case addressed whether auditors were entitled to examine records of employees who the employer denied were participants in the pension plan. Central States, 472 U.S. at 561. The dispute concerned whether employees were performing work under the jurisdiction of the pension plan, and this inquiry required examining records detailing the work that the employees were performing. Id. at 563-64. The Hospital argues the case is distinguishable because here the dispute is whether the Hospital is required to contribute to the Fund when engineering work is performed by subcontractors. Thus, the pertinent difference is that in Central States the type of work covered was defined by the plan, and thus, it was necessary to look at who was doing what type of work to find out who was covered, while here, the Hospital argues it is the type of worker that is covered, and such coverage is set out in the plan. This argument goes back to the text that the CBA states it "covers all Engineers employed by the Hospital." Amar Decl. Exs. A, B § 1.1. Thus, it covers the type of worker, and Central States is not directly on point.

The Hospital additionally points out that it provided auditors with copies of the CBAs (defining the Hospital's contribution obligation) as well as payroll lists, time cards and other documents showing wages paid and hours worked by Hospital Engineers. Ramsell Decl. ¶ 5. These, the Hospital argued, allowed the auditors to independently verify the Hospital's self-reporting of contributions.

Thus, the Court finds the journals are not reasonably relevant to or necessary for determining whether the Hospital has properly contributed to the Fund. Trustees then argue the journals are relevant and necessary to police the subcontracting provision generally, independent of contributions to the Fund. Opp'n at 11. This raises the third issue, the scope of the Trustees' power.

### 3. Scope of Trustees' Power

The Trustees argue in their Opposition that it is not necessary for the information to be relevant to contributions to the Fund, as the Trustees have the power to audit the Hospital to determine if it is compliance with all obligations under the CBA. "Although the Hospital has

14

1 the right to subcontract certain bargaining unit work, the Pension Fund has a contractual right
2 to police the subcontracting provision." Opp'n at 11. In support, the Trustees point to a
3 section of the Trust Agreement that states, "Each Individual Employer, upon request of an
4 authorized representative of the Union, the Employers, or the Fund, shall permit auditors
5 designated by the Fund to review any and all records relevant to the enforcement of the
6 provisions of the Collective Bargaining Agreement or this Trust Agreement." Amar Decl.
7 Ex. C § 6.04. Thus, the Trustees argue the Agreement provides for them to request any and
8 all documents to enforce any obligation of the CBA, including the subcontracting provision.
9 The Hospital argues this text must be read in context, and is actually a much narrower grant
10 of power. While arguably a close issue on the specific text cited, the overall context of the
11 language demonstrates such a broad reading is inappropriate.

12 The Trustees make no argument beyond pointing to the language of the Trust
13 Agreement to support their request to police the subcontracting clause of the CBA. The
14 Hospital argues that the language must be read in context of the entire agreement.

15 Section 6.04 of the Trust Agreement deals with the auditing powers of the Trustees to
16 determine contribution compliance. The first paragraph of the section sets out the Trustees'
17 right to request records from participating Employers that are "reasonably relevant to and
18 suitable for the purpose of [Fund] administration." Amar Decl. Ex. C § 6.04. The paragraph
19 then sets out the procedure for the Trustees to direct an on-site audit to examine such records
20 "as may be necessary to determine whether the Individual Employer is making full and
21 prompt payment of all sums required to be paid by him or it to the Fund." Id. The next
22 paragraph is the text cited by the Trustees, and it is followed by three paragraphs laying out
23 the procedures and penalties applied when such an audit reveals delinquent contributions. Id.

24 Thus, the Hospital argues that the paragraph at issue simply provides that the Union,
25 employers, or the Pension Fund may request an audit, just as the Trustees may do. It argues
26 that nothing about this section regarding audits makes the Trustees the enforcement body of
27 the CBA as a whole, and that to take the paragraph out of context in such a way would
28 contradict the Trust Agreement's provision that employers shall not "be under any other

15

1 liability to the Fund or with respect to the Plan except to that extent that . . . it may be an
2 Individual Employer required to make contributions to the Fund." Id. § 2.06. Moreover, the
3 Agreement states the role of the Trustees is "to control and manage the operation and
4 administration of the Fund and the Plan." Id. § 3.01.

Yet, the actual language is quite broad. It allows the Fund to review "<u>any and all records</u> relevant to the <u>enforcement of the provisions of the Collective Bargaining Agreements</u> or this Trust Agreement." Id. § 6.04 (emphasis added). At least initially, this would seem to allow the Fund to request any record for seemingly any purpose related to the CBA or the Fund. This incredible broadness in fact counsels against such an interpretation. If this was the proper meaning of the paragraph, then the prior paragraph limiting such rights of Trustees to reasonably relevant information necessary to determine whether proper contributions are being made to the Fund is superfluous. It also creates a conflict with the more limited grants of power other places in the Agreement, and is an odd place to put such a broad grant. Finally, it is conflict with the role of the Union as the enforcer of the CBA. Id. Exs. A, B. § XIII.1 (providing grievance and arbitration procedures). Therefore, the Court adopts the Hospital's interpretation of this language, and finds the Trustees do not have an independent right to enforce <u>any</u> provision of the CBA through the demand to audit <u>any</u> document they wish to see.

Since the information was not relevant to the Trustees' administration of the Hospital's obligations to the Trust, it is not necessary to reach the issue of whether the audit was requested with an improper purpose. Still, the Court notes that it does have concerns about the real purpose of the audit, given the claims made by the Trustees that contradict the language of the Agreements in ways that attempt to expand plan coverage and establish violations of the work jurisdiction clause of the CBA. See <u>Siemens</u>, 228 F.3d at 969 (stating such would be impermissible audit purposes). Accordingly, the Court grants the motion for summary judgment on the contract claim.

### B. Injunctive Relief Claim

ERISA section 502(a)(3) provides that a plan fiduciary may bring a civil action for injunctive or other equitable relief to enforce the terms of the plan. The availability of injunctive relief depends on whether the Trustees have a contractual right to the information requested. See Cal. Serv. Emps. Health & Welfare Trust Fund v. G.C. Theater Corp., No. 97-1602, 1998 WL 320846, at *9 (N.D. Cal. June 15, 1998) (finding injunctive relief inappropriate where there were still disputed issues of fact over defendants' obligation to contribute to the fund on behalf of subcontractors). Here, as discussed above, the CBA does not require contribution to the Fund on behalf of subcontractors. Thus, the Trustees do not have a contractual right to the audit they are requesting, and the Court grants the motion for summary judgment on the injunctive relief claim. See Siemens, 228 F.3d at 969 (stating cannot compel an audit to obtain information not within the scope of employer's contribution requirement).

### C. Damages Claim

The Hospital moves for summary judgment on the Trustees' claim for "damages according to proof" because with no present damages, the claim is premature. ERISA section 502(g)(2), 29 U.S.C. § 1132(g)(2), governs claims for delinquent contributions. Under this section, a plan fiduciary may assert damages in the form of unpaid contributions, interest, liquidated damages, and attorneys' fees and costs. 29 U.S.C. § 1132(g)(2)(A)-(D). Here, the Hospital argues Trustees cannot quantify any of these figures because no delinquent contributions were alleged at the time of filing. Courts have found such requests for future damages improper. See Crosthwaite v. Glavin Constr. Mgmt., 07-1241, 2007 WL 2790695, at *5 (N.D. Cal. Sept. 25, 2007) (denying plaintiffs' request for damages for unpaid contributions that may be found in a further audit because such an award would be "pure speculation" at that point); Bay Area Painters & Tapers v. Brown, 06-7509, 2007 WL 1302982, at *4-5 (N.D. Cal. May 3, 2007) (denying damages on possible delinquencies from a future audit because no basis to award damages until plaintiffs have calculated defendant's underlying contributions owed).

Plaintiffs did not oppose summary judgment on this claim, and have failed to show a genuine issue as to any material fact relevant to this claim. Thus, the Court grants summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons the Court GRANTS the Hospital's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: February 24, 2012

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE